IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:20-CR-439 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| YASER NAJJAR, | ) | GOVERNMENT'S RESPONSE TO |
| | ) | DEFENDANT'S SENTENCING |
| Defendant. | ) | MEMORANDA |

The United States of America, by and through undersigned counsel, hereby submits this sentencing memorandum response to Defendant's sentencing memoranda: (1) his brief on tax loss, with 824 pages of attachments (R. 44); and (2) his principal sentencing memorandum, with three attachments (R. 47). The government will explain at the sentencing hearing why a Guidelines sentence is appropriate under 18 U.S.C. § 3553(a).

**I.      INTRODUCTION**

The government submits that Probation has accurately calculated the applicable tax loss with relevant conduct for years 2009-2016. The government has conservatively estimated Defendant's underreporting of income, and his resulting tax due and owing, based on Defendant's concealed second set of books (his ledger of receipts), the reports of all the witnesses, bank records, and—critically—Defendant's own statements during the undercover operation in which he was selling the gas station business at issue.[1] Simply put, Defendant

---

[1] The government intends to call the case agent to present both its loss calculation and details of Defendant's and his broker's statements that support the government's position.

explained to the undercover that his ledger kept his true books for revenues and that the expense records he provided (which match what was on his tax returns) were accurate with the exception of employees he paid under the table in cash—an expense he is not permitted to claim now. Defendant went over in detail how easy it would be to cheat on the revenue and expenses on sale of food and drink inside his store, which he explained was highly profitable, to the tune of well over 100% on many items. He also explained how the gas station's proprietor could choose what to report on his taxes without concern, particularly with so much cash revenues and—in later years, when the station was not affiliated with a national gasoline brand—a range of suppliers of gasoline. He also described additional revenue from sources he was not reporting at all to the IRS: ATM fees, air machines, vendor rebates, and his car wash. Some of these could be confirmed in bank records. The required adjustments to his income (approximately $6 million over 8 years), and the resulting changes to his taxes due and owing, are set forth in Exhibit 1 to this memorandum, providing additional detail on the appropriate calculation of the loss here.[2]

Defendant's draft alternative tax returns submitted in support of his proposed loss figure, presented with large numbers of mysterious provenance, appear to invoke the same "the IRS will just have to trust me" logic that he described to the undercover. He claims to have painstakingly reviewed financial records to compile these returns, but these attempts to recreate valid tax

---

[2] Defendant yesterday provided the government with copies of tax returns for years 2017 to 2020, which were only filed after Defendant pled guilty in this matter. As this scheme was ongoing in 2017 when the search warrant was executed, and as Defendant continued for years after the same pattern of evading his tax obligations by making substantial income without truthfully accounting that income, until being indicted and pleading guilty, the government reserves the right to submit additional loss amounts that should be considered part of the relevant conduct in this matter.

returns illustrate why it is often said that you can't unscramble an egg. Defendant intentionally blurred the line between his personal and business accounts (and cash) for years, living lavishly himself and propping up the income of an extended family by cheating his fellow American taxpayers. Having rifled through boxes and hard drives of receipts and financial records, Defendant now asks the Court to take his accountant's word that he has accurately tallied the income and valid business expenses. But it is clear that his new accountant could not accurately separate out the egg whites and reconstitute the yolks here. The shortcuts taken in that process, moreover, show that this not a reliable method that just happened to arrive tax loss just below the $550,000 level, but was instead a result in search of a justification. In addition, Defendant's attempt to ignore years 2009-2010, despite the evidence that Defendant was committing tax fraud in those years as part of the same course of conduct, is without merit.

Finally, Defendant's attempt to go back in time and benefit from an election on the depreciation of the car wash is at odds with both tax law and criminal law.

## II. ARGUMENT

### A. THE GOVERNMENT'S CALCULATION OF THE APPLICABLE LOSS.

The government sought to determine the amount by which Defendant's business income from the gas station (or "East 152nd Inc.") was underreported, and that income figure flowed through to be reported on Schedule E of his joint Form 1040 income tax return.

#### 1. Receipts

The business receipts took multiple forms, only three of which were reported to the IRS.

*Gasoline and Inside Sales*: The primary source of revenue was the sale of gasoline. Second was the sale of food, beverage, and miscellaneous sales inside the gas station (the "inside sales"). Both of these sources of income were reported, but they were substantially under-reported to Defendant's accountant, Paul Stein, which caused Stein to prepare returns that had

the same flaw. The government relies primarily on Defendant's secret ledger of sales[3] for the bulk of the revenue totals, particularly for gasoline sales and inside sales—both of which Defendant meticulously tracked on a daily basis. The government compiled all of those ledger entries from 2009 through at least 2016 to determine the true totals of receipts for those items. Defendant does not appear to materially dispute these figures.[4]

There are a number of income sources that were not reported to Stein or to the IRS, which Defendant explained were not included in his sales ledger.

*ATM Receipts*: The business also received regular income from the presence of an ATM at the station. The money received was deposited monthly into Defendant's bank accounts. The government has totaled up those deposits, and used the year's average for the few months where no record was found, and provided a schedule of these deposits to the defense. The annual totals are listed in Exhibit 1.

*Air Machine Receipts*: The business also received income from air machines. Defendant explained to the undercover, including through the sales broker he employed, that he made $500/month, resulting in a total of $6,000 per year. The government found photographic

---

[3] Defendant disputes that his ledger was a "second set of books" but also acknowledges that it was used to track sales. Defendant claims that the primary purpose was to "track where he stood with Beck's, his fuel supplier," in light of their unique arrangement, and secondarily for comparing yearly changes. (R. 44, PageID 140.) But Defendant continued to maintain the same *daily* records for years after his arrangement with Beck's ended.

[4] The third category of revenue Defendant *did* report on his taxes was from the lottery business. It was difficult for Defendant to fake these numbers, since he was issued a 1099 for the income he received each year. As a result, Defendant had little choice but to provide true figures for lottery income to Stein. In turn, Stein appears to have accurately recorded those amounts as other income on the business returns. Because the lottery business included no unreported income, there was no reason to include lottery in the government's calculation. For reasons that are unclear, despite the existence of the 1099s with clear income figures, which Defendant should have reported each year, Defendant instead includes a purported tally of lottery revenue and expenses for each year.

4

evidence that this machines had been present at least since 2011, and so conservatively only included this income for that year forward, as listed in Exhibit 1.

*Tobacco Vendor Rebates*: Defendant regularly received rebates from tobacco companies as part of their sale strategy. These amounts were totaled in the bank records for 2013-2016 (between $24,450 and $44,872), and partially totaled for earlier years, but conservatively estimated at $20,000 per year for 2009-2012, as listed in Exhibit 1.

*Car Wash Receipts*: Finally, Defendant began in February 2016 to operate a car wash at the business. Using Defendant's and his broker's description of the business, the government totaled the receipts that Defendant would have received from this business, which the broker described as "huge."

All told, comparing the income Defendant reported to Stein and affirmed in his tax returns, Defendant had approximately $6 million in gross receipts that were not reported.

    2.    <u>Expenses</u>

Defendant spends much of his time cobbling together receipts for various expenses and faults the government for not doing likewise. But Defendant's own statements indicate that the expense side of the returns was basically accurate. To begin, Defendant regularly provided Stein his true records for his purchases of gasoline, and Stein faithfully reported those figures. Defendant's attempt to take a rifle shot at Stein's handling of gasoline costs, claiming that he omitted the 2014 freight costs is actually refuted by the very records on which Defendant relies, which shows Stein reporting exactly the amounts that Defendant claims were omitted. Gasoline costs were by far the largest category of expenses.

Further, as to Defendant's other costs, Defendant's evasion strategy—in which he explained he freely took cash from the business to spend as he saw fit on his personal life, occasionally paid small business bills in cash, and regularly used business accounts to pay for

5

personal items—make it impossible to tally accurate expense totals. At bottom, the expenses he instructed Stein to use for the fake inside sales totals (75% of those receipts) appears to match the true expenses for the real inside sales, in essence because Defendant made a much higher margin on his inside sales than he instructed Stein to use (reporting only 25% of receipts as profit).

In discussions with the undercover, for example, Defendant explained that, while he made a lower margin on, for example, cigarettes (21%—at least without the unreported rebates), on average, his margin was more like 70%. This is because his markup on drinks was between 100% and 400%. Kitchen sales were even higher markups, and those were about a quarter of inside sales. Defendant provided the example of chicken tenders, paying $76 for what would later sell for $960. In a typical month, Defendant estimated that $10,000 in costs would return $45,000 to $50,000 in sales.

Further buttressing the impression that the inside sales costs reported were accurate was Defendant's highly specific description of what was missing from the "official" numbers. Defendant clarified to the undercover that the tax return numbers did not include *all* of the expenses only because they were missing the wages paid to employees in cash. Defendant explained that he paid himself about $7,000 per month, but paid employees under the table about $15,000 per month, and those expenses would be missing from the tax return figures, which he conceded was a significant expense.

While the government has endeavored to determine whether the expense figures reported were reasonably accurate, and believes that they are for the reasons described above, Defendant bears the burden of proving deductions. U.S.S.G. § 2T1.1, n.3.

>   B.   DEFENDANT'S CALCULATIONS ARE UNEXPLAINED, AND DEEPLY FLAWED.

It is difficult for the government to outline all of the flaws in Defendant's calculations, as much of them are unexplained other than through blanket statements that his CPA has reviewed and determined certain expenses to be valid.  The government appreciates that the defense has recently clarified that the basis for its position is detailed further in certain records that were previously provided, and so is reviewing those records.  The government also understands from Defendant's filing and conversations with the defense that it may be revising its calculation and figures to add some income and possibly to remove some expenses.

But Defendant notes certain issues here that appear to be insurmountable.  First, Defendant's calculations appear to rely on large and thinly supported "general ledger adjustments," the purpose of which seems to be to make the numbers more favorable or more plausible, or to match up with invoices that have been located, which are presumed to have been paid in cash.  Among the many problems with this method is that simply assuming these cash payments were made is contrary to Defendant's own words.  Defendant reported that all significant payments were made by check or bank, and he only paid small amounts in cash, which he described as bills of $60-$70.

Defendant's CPA appears to have combed through for tax expenses, for example, but in doing so blurred the distinction between Defendant himself and his business—an understandable mistake given Defendant's means of evasion.  The CPA, for example, appears to have included as expenses county taxes paid on the real estate, but Defendant himself owned the real estate, and that is why the business could also claim (and did claim) as an expense deduction the rent that the business paid to Defendant.

7

Defendant's reliance on the Section 179 deduction is wrong on the law and on the facts. First, on the law, Defendant is not permitted to go back and choose a new means of depreciation to advantage him now that he has been caught in a fraud. The Commission explained when submitting to Congress the relevant Guidelines amendment (that permits any defendants to claim any previously unclaimed deduction) that defendants "should not be permitted to invoke . . . after-the-fact changes or characterizations—such as . . . substituting a more advantageous depreciation method or filing status—to lower the tax loss." *See* U.S.S.G., Adopted Amendment (April 30, 2013), p. 23, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20130430_RF_Amendments_0.pdf. That is precisely what Defendant is trying to do here.

Even if such an after-the-fact election was permitted, which it is not, and even if some or all of the car wash building could qualify as "equipment" subject to a Section 179 deduction, Defendant would not be permitted to take the deduction in 2015, as he seeks to. Curiously, Defendant references Section 179 repeatedly, but omits a key detail of its contents. The statute begins straightforwardly, "A taxpayer may elect to treat the cost of any section 179 property as an expense which is not chargeable to capital account. Any cost so treated shall be allowed as a deduction *for the taxable year in which the section 179 property is* **placed in service**." 26 U.S.C. § 179(a) (emphasis added). Defendant has always been clear that construction was completed and this property began to be used—that is, it was placed in service—in 2016, not in 2015. Again, his CPA's methodology appears to begin with the result, not with the rules.

**III.     CONCLUSION**

For these reasons, Probation has accurately calculated Defendant's Guidelines range. The government will explain at sentencing why a Guidelines sentence is appropriate under 18 U.S.C. § 3553(a), and will request that full restitution be ordered as a condition of supervision, and a fine in the amount of any loss not included in restitution.

                                      Respectfully submitted,

                                      MICHELLE M. BAEPPLER
                                      First Assistant United States Attorney

By:   /s/ Elliot Morrison
          Elliot Morrison (OH: 0091740)
          Assistant United States Attorney
          United States Court House
          801 West Superior Avenue, Suite 400
          Cleveland, OH 44113
          (216) 622-3919
          Elliot.Morrison@usdoj.gov